[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11909

_____

Agency No. 001795-13

HOMERO F. MERUELO,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(May 6, 2019)

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and VRATIL,* District
Judge.

WILLIAM PRYOR, Circuit Judge:

---

* Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by
designation.

This appeal from the disallowance of a taxpayer's claimed deduction for his share of losses suffered by an S corporation presents the following issue: whether monetary transfers between various business entities partly owned by the taxpayer and an S corporation that were later reclassified as loans from the taxpayer to the S corporation established a "bona fide indebtedness" that "runs directly" to the taxpayer. Treas. Reg. § 1.1366-2(a)(2)(i); *see also* 26 U.S.C. § 1366. Homero Meruelo was a shareholder of Merco of the Palm Beaches, Inc., which suffered a nearly $27 million loss after banks foreclosed on its condominium complex. Meruelo asserted that he had a sufficient basis in Merco's indebtedness for him to deduct $13 million as his share of the loss. Meruelo claimed basis from a $5 million capital contribution he made to Merco and more than $9 million of indebtedness from net transfers through various other business entities in which he held an interest. The Internal Revenue Service determined that he could claim only the $5 million basis and not the $9 million because any debt ran from Merco to the other entities. The Tax Court later ruled that Meruelo had failed to establish a bona fide indebtedness of $9 million running directly to him and that he failed to establish that he made an "actual economic outlay" toward the debt. Because the Tax Court correctly determined that Meruelo did not establish a bona fide indebtedness that ran directly to him, we affirm.

2

## I. BACKGROUND

Meruelo, a real estate developer in south Florida, owns interests in several S corporations, partnerships, and limited liability companies. One of these entities was Merco of the Palm Beaches, Inc., an S corporation Meruelo incorporated in March 2004. Meruelo held 49 percent of Merco's stock.

Subchapter S of the Internal Revenue Code provides "a pass-through system under which corporate income, losses, deductions, and credits are attributed to individual shareholders in a manner akin to the tax treatment of partnerships." *Buffered v. Comm'r*, 506 U.S. 523, 525 (1993). A shareholder's ability to deduct his proportionate share of a corporation's net operating losses is limited by the sum of his basis in his stock and the corporate indebtedness to him. *See* 26 U.S.C. § 1366(d)(1). In other words, the shareholder can increase his basis by contributing capital to the corporation or by lending money to it.

Meruelo incorporated Merco to purchase a condominium complex in a bankruptcy sale. In early 2004, the bankruptcy court approved the sale and required Merco to pay a $10 million non-refundable deposit to secure the property. To raise funds for his share of the deposit, Meruelo obtained a personal loan.

Meruelo transferred $4,985,035 of the loan proceeds to Merco Group at Akoya, an S corporation in which he and his mother each held a 50 percent interest. In March 2004, Akoya transferred into Merco's escrow account $5

3

million—$4,985,035 of Meruelo's loan proceeds and $14,965 of Akoya's own funds—to cover half the required deposit. Akoya had also previously transferred to Merco enough funds to cover the $5 million balance of the deposit. The Commissioner does not dispute that the $4,985,035 transfer gave Meruelo a shareholder basis in that amount in Merco.

From 2004 to 2008, Merco entered into hundreds of transactions with various partnerships, S corporations, and limited liability companies in which Meruelo held an interest. These Merco affiliates often paid expenses, such as payroll costs, for each other or for Merco to simplify accounting and enhance liquidity. The payor company recorded these payments to its affiliates as accounts receivable, and the payee company recorded them as accounts payable. Between 2004 and 2008, Merco affiliates made more than $15 million in payments to or on behalf of Merco, and Merco repaid its affiliates less than $6 million of these payments. On December 31 of each year, Merco's books and records showed substantial net accounts payable to its affiliates.

Luis Carreras, a certified public accountant, prepared the tax returns filed by Meruelo, Merco, and the Merco affiliates. When preparing Merco's tax return for a given year, Carreras would net Merco's accounts payable to its affiliates, as shown on Merco's books as of the preceding December 31, against Merco's accounts receivable from its affiliates. If Merco had net accounts payable, Carreras reported

4

that amount as a "shareholder loan" on Merco's tax return. Carreras then allocated a percentage of this indebtedness to Meruelo based on Meruelo's ownership interests in the various affiliates that had transferred funds to Merco.

In March 2004, Carreras drafted a promissory note for Meruelo purportedly to make a $10 million unsecured line of credit available to Merco at a six percent interest rate. Carreras testified that, when he prepared Meruelo's and Merco's tax returns for tax years 2004 to 2008, he made an annual charge to Merco's line of credit for an amount equal to Meruelo's calculated share of Merco's net accounts payable to its affiliates for the preceding year.

In 2008, Merco incurred a loss of $26,605,840 when banks foreclosed on the condominium complex it purchased in 2004. Merco reported this loss on its income tax return, and Merco allocated 49 percent of the loss to Meruelo.

Meruelo filed income tax returns for 2005 and 2008. On his 2005 return, he reported taxable income of $13,895,731 and tax due of $4,843,976. On his 2008 return, he claimed an ordinary loss deduction of $11,795,109. This deduction reflected a $13,036,861 flow-through loss from Merco ($26,605,840 × 49 percent) netted against gains of $1,241,752 from two other S corporations in which he held interests. After accounting for other income and deductions, Meruelo reported a net operating loss of $11,793,865 on his 2008 return. In October 2009, he applied for a tentative refund asserting a net operating loss carryback of $11,793,865 from 2008

5

to 2005. After applying this net operating loss carryback, his original tax lability for 2005, $4,843,976, was reduced by $3,897,470, to $946,506. In January 2010, the Internal Revenue Service issued Meruelo a refund of $3,897,470.

The Internal Revenue Service selected Meruelo's 2005 and 2008 returns for examination. It determined that his basis in Merco was only $4,985,035 based on the proceeds of the bank loan that Meruelo contributed to Merco through Akoya. It disallowed, for lack of a sufficient basis, $8,051,826 of the $13,036,861 flow-through loss claimed for 2008.

After disallowing part of the net operating loss for 2008, the Commissioner determined that Meruelo's carryback to 2005 was limited to $3,706,272 and that his correct tax due for 2005 was $3,546,781. Because Meruelo had reported a tax liability of only $946,506 for 2005, the Commissioner concluded that Meruelo's tax deficiency for that year was $2,600,275 and sent Meruelo a notice of deficiency.

Meruelo petitioned the Tax Court for redetermination of his tax deficiency. He alleged that he had a sufficient basis in Merco for him to fully deduct his share of its 2008 losses. Meruelo alleged that his basis in Merco consisted of $2.7 million of Akoya's first deposit of $5 million, all $5 million of Akoya's second deposit, and $6,616,857 for his share of intercompany transfers.

6

Meruelo offered two theories to claim credit for the affiliated companies' transfers to Merco: the "back-to-back loan" theory and the "incorporated pocketbook theory." Under the back-to-back-loan theory, he argued the affiliated companies should have been treated as lending funds to him that he then lent to Merco. And under the incorporated-pocketbook theory, Meruelo argued that he should have been treated as using his funds, which were held by the affiliated companies, to pay Merco's expenses on his behalf.

After a trial, the Tax Court ruled for the Commissioner. The Tax Court acknowledged that Meruelo had an undisputed basis of $4,985,035 in Merco, and it explained that only $8,051,826 of the $13,036,9861 flow-through loss was in dispute. But the Tax Court determined that Meruelo was not entitled to any of the disputed basis.

The Tax Court explained that section 1366(d)(1)(B) of the Internal Revenue Code allows a shareholder to increase his basis by the amount of the adjusted basis of any indebtedness owed by the S corporation to the shareholder. Because the Code "does not specify how a shareholder may acquire basis in an S corporation's indebtedness to him," the Tax Court turned to the legislative history of the predecessor to section 1366 for guidance. The Tax Court explained that earlier decisions relied on this legislative history and construed language about "a shareholder's investment in a corporation" to require an "actual economic outlay"

7

by the shareholder. In other words, the Tax Court ruled that a shareholder must show that he incurred a cost in making a loan or that he was left poorer in a material sense after the transaction.

The Tax Court decided that the test for determining a shareholder's basis in an S corporation under Treasury Regulation § 1.1366-2(a)(2)—which was amended in 2014 and limits debt basis to "bona fide indebtedness of the S corporation that runs directly to the shareholder"—was effectively the same as that under the "actual economic outlay" doctrine. The Tax Court explained that it had long required that a shareholder prove an S corporation's indebtedness running directly to him to deduct his proportionate share of the corporation's net operating loss. And the Tax Court reasoned that because the 2014 regulation states that "bona fide indebtedness" is to be determined by "general Federal tax principles," the 2014 regulation incorporates the actual economic outlay doctrine.

The Tax Court rejected Meruelo's back-to-back-loan theory because there was no evidence that funds had been lent to Meruelo and then lent back to Merco. The Tax Court acknowledged that bona fide back-to-back loans, first from an affiliated company to a shareholder and then from the shareholder to the debtor S corporation, can increase a shareholder's basis. But it explained that a shareholder is bound by the form of the transaction he initially chose and that transactions directly among related companies (and not involving the shareholder) do not

8

qualify as back-to-back loans. The Tax Court clarified that a taxpayer-shareholder cannot reclassify intercompany loans as shareholder loans for tax purposes when preparing his return. The Tax Court then ruled that, because there was no evidence that the Merco affiliates had contemporaneously booked transfers between them as shareholder loans—the affiliates instead labeled them as accounts receivable and payable, wage payments, or capital contributions—Meruelo's back-to-back-loan theory failed. The Tax Court also ruled that, because Meruelo made no actual economic outlay toward the monetary transfers from the Merco affiliates to Merco, he could not claim that these transfers amounted to a shareholder loan.

The Tax Court likewise rejected Meruelo's incorporated-pocketbook theory. The Tax Court explained that, although some of its rulings allowed basis increases under an incorporated-pocketbook theory, the facts here were a "far cry" from those decisions. The Tax Court explained that in other incorporated-pocketbook decisions, the taxpayer habitually used a single, wholly owned corporation to pay third parties on his behalf. But many of the Merco affiliates had co-owners besides Meruelo, and Meruelo had not shown that these affiliates had a "habitual practice" of paying his personal expenses. And the Tax Court explained that the "incorporated pocketbook" corporations contemporaneously booked the disbursements as shareholder loans. The Merco affiliates, by contrast, booked their transactions as capital contributions, payroll expenses, or intercompany accounts

9

payable and receivable, and only relabeled the disbursements as shareholder loans at the close of each year. The Tax Court upheld the Commissioner's determination of a $2,600,275 deficiency.

## II. STANDARD OF REVIEW

We "review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). "The interpretation of a statutory section of the Internal Revenue Code by the tax court is a question of law reviewed *de novo*." *McLaulin v. Comm'r*, 276 F.3d 1269, 1272 (11th Cir. 2001).

## III. DISCUSSION

Section 1366 permits a shareholder of an S corporation to deduct his *pro rata* share of a net operating loss sustained by the corporation:

> **(a) Determination of shareholder's tax liability.—**
>> **(1) In general.**—In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends . . . , there shall be taken into account the shareholder's pro rata share of the corporation's—
>>> **(A)** items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder, and
>>> **(B)** nonseparately computed income or loss.
>
> . . .
> **(d) Special rules for losses and deductions.—**
>> **(1) Cannot exceed shareholder's basis in stock and debt.**—The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of—

10

> **(A)** the adjusted basis of the shareholder's stock in the S corporation . . . , and
> **(B)** the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder . . . .

26 U.S.C. § 1366. Under section 1366(a)(1), an S corporation's income and operating losses are passed through to its shareholders in a similar way to the tax treatment of partnerships. *Buffered*, 506 U.S. at 525; *Ellinger v. United States*, 470 F.3d 1325, 1329 n.2 (11th Cir. 2006). A shareholder may deduct his portion of an S corporation's net operating losses only to the extent that the loss does not exceed the sum of "the adjusted basis of the shareholder's stock in the S corporation," 26 U.S.C. § 1366(d)(1)(A), and "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder," *id.* § 1366(d)(1)(B). This appeal concerns only a shareholder's adjusted basis of indebtedness under section 1366(d)(1)(B).

Meruelo argues, and the Commissioner agrees, that the governing regulation, Treas. Reg. § 1.1366-2, as amended in 2014, provides a standard of "bona fide indebtedness" that must run "directly to the shareholder" for determining a shareholder's debt basis in an S corporation:

> **(2) Basis of indebtedness—(i) In general.** The term basis of any indebtedness of the S corporation to the shareholder means the shareholder's adjusted basis . . . in any *bona fide indebtedness* of the S corporation *that runs directly to the shareholder*. Whether indebtedness is bona fide indebtedness to a shareholder is determined under general Federal tax principles and depends upon all of the facts and circumstances.

11

Treas. Reg. § 1.1366-2(a)(ii)(2) (emphasis added). The Commissioner also agrees that this regulation applies to Merco's losses for the 2005 and 2008 tax years because those tax years were still open for assessment in July 2014. *See id.* § 1.1366-5(b) (explaining that the regulation applies "with respect to indebtedness between an S corporation and its shareholder that resulted from any transaction that occurred in a year" that was still open for assessment on July 23, 2014).

An S corporation's debt does not run directly to the shareholder if it instead flows through "an entity with passthrough characteristics which advanced the funds and is closely related to the taxpayer." *Hitchins v. Comm'r*, 103 T.C. 711, 715 (1994). But the 2014 regulation provides that if a shareholder engages in genuine "back-to-back" loans—in which an affiliated entity loans the shareholder funds that he then loans directly to the S corporation—those loans can establish bona fide indebtedness running directly to the shareholder. *See* Treas. Reg. § 1.1366-2(a)(2)(iii) ("**Example 2.** Back-to-back loan transaction. A is the sole shareholder of two S corporations, S1 and S2. S1 loaned $200,000 to A. A then loaned $200,000 to S2 . . . If A's loan to S2 constitutes bona fide indebtedness from S2 to A, A's back-to-back loan increases A's basis of indebtedness in S2 . . . ."). So to claim a deduction under section 1366(a), Meruelo had to establish that a bona fide indebtedness of Merco ran directly to him.

12

Meruelo presents two alternative arguments that the Tax Court erred in disallowing his deduction. First, he contends that Merco's debt ran directly to him under a back-to-back-loan theory. Second, he contends that the debt ran directly to him under an incorporated-pocketbook theory. Both arguments fail.

### A. Meruelo's Back-to-Back-Loan Theory Fails Because Merco's Debt Ran to the Merco Affiliates, Not to Meruelo.

Meruelo argues that he can claim a debt basis based on his back-to-back-loan theory for two reasons. First, he argues that we should treat the monetary transfers between the Merco affiliates as back-to-back loans based on the economic substance of the transactions rather than the form they took. Second, he alternatively contends that the form of the transactions was sufficient to establish that they amounted to back-to-back loans.

Meruelo's argument for substance over form is a nonstarter. Taxpayers are ordinarily "liable for the tax consequences of the transaction they actually execute and may not reap the benefit of some other transaction that they might have made." *Selfe v. United States*, 778 F.2d 769, 773 (11th Cir. 1985). "In other words, taxpayers ordinarily are bound by the 'form' of their transaction and may not argue that the 'substance' of their transaction triggers different tax consequences." *Id.* The Supreme Court has explained that although "a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the

13

benefit of some other route he might have chosen to follow but did not." *Comm'r v. Nat'l Alfalfa Deyhdrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted).

The parties cite, and we are aware of, only a single decision in which we have agreed with a taxpayer that an exceptional circumstance could warrant looking to the substance of a transaction instead of its form as having a different tax consequence. *See Selfe*, 778 F.2d at 774. The taxpayer-shareholder in *Selfe* had initially obtained a loan in her individual capacity to fund her fledgling retail clothing business and pledged her personal assets as collateral. *See id.* at 770. At the bank's request, she agreed to convert her loan into one from the bank to the S corporation where she guaranteed the corporation's indebtedness to the bank and continued to pledge her assets as collateral. *Id.* at 770–71. We concluded that, in the light of the circumstances suggesting that the bank looked to the shareholder as the primary obligor on the loan instead of the thinly capitalized S corporation, genuine issues of material fact existed as to whether the guaranteed loan was effectively a back-to-back loan through the shareholder. *Id.* at 774–75. We remanded to determine whether the shareholder's guaranty amounted to either a shareholder loan or an equity investment. *Id.* at 775.

Nothing akin to the exceptional circumstance in *Selfe* occurred here. Only an "unusual set[] of facts" can warrant judging a transaction based on its substance

14

instead of its form. *Sleiman v. Comm'r*, 187 F.3d 1352, 1359 (11th Cir. 1999) (refusing to extend the approach from *Selfe* to treat a shareholder-guaranteed loan to an S corporation as if it were a back-to-back loan where the lender looked to the shareholder as only a secondary obligor). Meruelo's argument about the substance of his transaction—that a portion of the funds the affiliates transferred to Merco could be considered profits that Meruelo was otherwise entitled to receive and that the funds were used to pay Merco's business expenses—hardly presents an "unusual set of facts" about intercompany monetary transfers, and it does not justify setting aside our ordinary rule that the taxpayer is bound by the form his transactions. *See Shebester v. Comm'r*, 53 T.C.M. (CCH) 824 (1987) (rejecting taxpayer's contention that loans from one controlled S corporation to another controlled S corporation were in substance a series of dividends to the shareholder from one corporation followed by loans from the shareholder to the other corporation).

Meruelo also argues that his accountant's end-of-year reclassification of the intercompany transfers, as reflected on his tax returns and on the annual adjustments to the line-of-credit from the 2004 Note, were sufficient to establish that the transactions amounted to shareholder, but we disagree. "After-the-fact reclassification cannot satisfy the requirement that the debt run directly from the S corporation to the taxpayer/shareholder, and courts have previously rejected efforts

15

by taxpayers to establish debt basis in an S corporation using this method." *Broz v. Comm'r*, 727 F.3d 621, 627 (6th Cir. 2013); *Ruckriegel* v. *Comm'r*, 91 T.C.M. (CCH) 1035 (2006) (ruling that yearend reclassification of intercorporate loans as back-to-back loans through the taxpayer was insufficient to provide debt basis); *Burnstein v. Comm'r*, 47 T.C.M. (CCH) 1100 (1984) (same). Because the transactions were contemporaneously classified as transactions between the affiliates and Merco, the designation Meruelo's accountant gave them at the end of the year does not govern. And we agree with the Tax Court that the accountant's adjustments to "a notional line of credit, uniformly made after the close of each relevant tax year, do not suffice to create indebtedness to [Meruelo] where none in fact existed."

### B.  Meruelo's Incorporated-Pocketbook Theory Fails Because the Merco Affiliates Were Not His Incorporated Pocketbook.

Meruelo alternatively contends that he can claim debt basis based on his incorporated-pocketbook theory. This theory holds that "[a] taxpayer can obtain debt basis in an S corporation through payments made by a wholly owned corporate entity if that entity functions as the shareholder's 'incorporated pocketbook,' meaning that the taxpayer has a 'habitual practice of having his wholly owned corporation pay money to third parties on his behalf.'" *Broz*, 727 F.3d at 627–28 (citation omitted). In two decisions, the Tax Court has ruled that payments made to an S corporation by a taxpayer's "incorporated pocketbook"

16

company were sufficient to establish the shareholder's debt basis. *See Yates v. Comm'r*, 82 T.C.M. (CCH) 805 (2001); *Culnen v. Comm'r*, 79 T.C.M. (CCH) 1933 (2000), *rev'd on other grounds*, 28 F. App'x 116 (3d Cir. 2002).

Even if we assume that the incorporated-pocketbook theory comports with the requirement that a debt run "directly to the shareholder," Meruelo failed to establish that the Merco affiliates constituted his incorporated pocketbook. Unlike the shareholders in *Yates* and *Culnen*—who used a single, wholly owned entity to pay third parties on the shareholder's behalf—Meruelo seeks to treat eleven distinct Merco affiliates, many of which he only partially owned, as his incorporated pocketbook. Many of the Merco affiliates acted more like ordinary business entities than as incorporated-pocketbook companies because they both disbursed and received funds for business expenses from Merco. As the Tax Court explained, no court has ever ruled that a group of non-wholly owned entities that both receive and disburse funds in this fashion can constitute an incorporated pocketbook. And Meruelo failed to establish that he habitually paid third parties on his behalf through the putative incorporated-pocketbook companies. Meruelo's evidence established only that the Merco affiliates regularly paid the expenses of other companies within the affiliate group—not his personal expenses. *See Broz*, 727 F.3d at 628 (affirming Tax Court's rejection of taxpayers' "incorporated pocketbook" argument where the taxpayers failed to establish that they habitually

17

paid third parties through the entities); *Messina v. Comm'r*, 114 T.C. Memo. 2017-213, at \*32–33 (2017) (rejecting theory on the same ground); *Ruckriegel*, 91 T.C.M. (CCH) 1035 (same).

## IV. CONCLUSION

We **AFFIRM** the judgment of the Tax Court in favor of the Commissioner.